UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-CV-20300-RAR

CHRISTOPHER J. MADAIO,

      Plaintiff,

v.

UNITED STATES OF AMERICA,

      Defendant.

_____/

**ORDER GRANTING MOTION TO DISMISS**

**THIS CAUSE** comes before the Court on Defendant United States of America's Motion to Dismiss ("MTD"), [ECF No. 51]. Defendant seeks dismissal of Plaintiff, Christopher J. Madaio's *pro se* "[Amended] Civil Action with Respect to Violations of the Privacy Protection Act of 1980" ("Amended Complaint"), [ECF No. 19]. In the Amended Complaint, Plaintiff alleges that Defendant violated his rights "in seizing all [his] work product materials and other documents" at Miami International Airport on July 11, 2024, which, he claims, entitles him to damages under the Privacy Protection Act, 42 U.S.C. § 2000aa. Am. Compl. at 1 (cleaned up). After careful review of the governing law, the record, the parties' arguments, and being otherwise fully advised, the MTD is **GRANTED**.

**BACKGROUND**

I.     **Plaintiff's Amended Complaint**

Plaintiff describes himself as an experienced "published photographer," one whose "original photos" appeared in a photobook titled *Il Ritrato Giovanile*, which sold 500 copies. Am. Compl. at 4. He says that "several articles [have been] published on himself" and that his work

has been featured in "many photo exhibitions," both in the United States and abroad. *Id.* But Plaintiff's career has not unfolded without incident. In 2004, the Federal Bureau of Investigation ("FBI") discovered 691 images classified as child pornography on his personal computers. *See Madaio v. Fed. Bureau of Investigation*, No. CV-06-BE-00904, 2008 WL 11392887, at *2 (N.D. Ala. Mar. 31, 2008). Two years later, Plaintiff pleaded guilty to possessing and knowingly receiving material containing child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(a)(2)(A), and was sentenced to 60 months' imprisonment. *See id.*; *see also* Am. Compl. at 5.

Nearly two decades later, Plaintiff attempted to rebuild both his career and his finances. By June 2023, he had returned to Alabama, where his "financial situation worsened" over the following year. Am. Compl. at 5. In March 2024, he "was contacted by an entrepreneur," Brandon Bello, who "offer[ed] to purchase [the] exclusive rights to all [of Plaintiff's] photos" with the aim of publishing and selling two photobooks. *Id.* After several months of discussions, the two entered into "a contractual agreement." *Id.* at 6. Under that agreement, Plaintiff "would work for an indeterminate time as an engineer at [ ] Bello's biofuel plant near Yopal, Colombia," while also delivering his photographic archive—"all his personal/scanned photos[ ] taken over the past fifty-five years"—to facilitate "a final selection of photos" and "setting out a suitable layout of the two photobooks." *Id.* To that end, Plaintiff traveled with "a separate USB flashdrive containing photo and contractual info[rmation] pertaining to the proposed photobooks." *Id.*

The trip did not unfold as planned. Plaintiff never made it beyond Bogotá Airport. Colombian authorities allegedly "denied [him] entry to Colombia," and he "was immediately returned on the next available flight to Miami International Airport[.]" *Id.* Upon his arrival in Miami on July 11, 2024, Plaintiff claims that "U.S. Customs officials and agents from the

Dep[artment] of Homeland Security proceed[ed] to seize indiscriminately all of [his] digital media," including materials he says were necessary "to complete his contractual obligations[.]" *Id.* at 6–7. Plaintiff returned to Alabama by September 20, 2024; there, he was arrested and later denied bond. *See id.* at 7. He alleges that, as a result of the "search and seizure, arrest, and continual incarceration [without] bond[,]" he "cannot fulfill his contractual obligations as a publisher/published photographer" and that it is "unlikely he[ ] [will] be able to work as such in the future." *Id.*

## II.    Screening

On July 7, 2025, the Court screened Plaintiff's Amended Complaint pursuant to 28 U.S.C. § 1915A. *See* Order Screening Amended Complaint, [ECF No. 21]. Plaintiff cleared the Act's threshold requirements at the pleading stage. *See* 42 U.S.C. §§ 2000aa(a), (b). He alleged that a government officer conducted a search or seizure tied to a criminal investigation. *See id.*; *see also* Am. Compl. at 2 (asserting that DHS officer Kenny Silva's "primary responsibility" was the "search and seizure of all Plaintiff's digital media at Miami International Airport on the 11th of July, 2024"). The seized materials fell within the Act's definition of "documentary materials," as Plaintiff said officials "seize[d] indiscriminately all of [his] digital media," including a "selection" of photographs "taken over . . . [fifty-five] years." *Id.* at 6 (cleaned up); *see also* 42 U.S.C. § 2000aa-7(a).

He also alleged that he possessed those materials "in connection with a purpose to disseminate [them] to the public" through a photobook or similar medium affecting interstate or foreign commerce. 42 U.S.C. § 2000aa(b). And the Amended Complaint tied that purpose to a publishing arrangement, asserting that the "search and seizure . . . means [Plaintiff] cannot fulfill his contractual obligations as a publisher/published photographer[,]" and that his ability to work

in that capacity was in doubt.  Am. Compl. at 7; *see also* 42 U.S.C. § 2000aa(b).  The Court therefore found that Plaintiff plausibly stated a claim against the United States under the Privacy Protection Act.  *See generally* Order Screening Amended Complaint.

### III.      Defendant's Motion to Dismiss

The Government advances several grounds for dismissal under Federal Rule of Civil Procedure 12(b)(6).  To start, it invokes the Act's suspect exception, arguing that "the [Act] does not apply when the materials are seized from a criminal suspect and the materials relate to the crime," and that Plaintiff "fails to state a claim under the PPA because he is the criminal suspect and the materials seized related to the crime."  MTD at 1–2 (referencing 42 U.S.C. §§ 2000aa(a)(1), (b)(1)).  It emphasizes that agents discovered "suspected child sexual abuse material (CSAM)" during the border search and that forensic review revealed "over one thousand (1,000) images of suspected child pornography"—facts that it says establish probable cause and bring Plaintiff's case squarely within the exception.  *Id.* at 4–5.  The Government also stresses that the Act protects "innocent third parties," not individuals "suspected of committing the crime under investigation," and that Plaintiff's status as a suspect forecloses relief.  *Id.* at 7–8.

Further, the Government relies on the border exception, arguing that the statute expressly does "not impair or affect the ability of a government official or employee . . . to conduct searches and seizures at the borders," and that Plaintiff admits the seizure occurred while he was reentering the United States.  *Id.* at 9–10 (referencing 42 U.S.C. § 2000aa-5).  It also characterizes Plaintiff's allegations of government orchestration as "vague and conclusory" and "implausible," noting his failure to plead supporting facts or raise such claims in his criminal case.  *Id.* at 10–11.  Finally, the Government adds that most of Plaintiff's seized devices were forfeited following Plaintiff's conviction, further undermining any viable claim under the Act.  *Id.* at 9.

## **LEGAL STANDARD**

To survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* FED. R. CIV. P. 12(b)(6). When reviewing a motion to dismiss under Rule 12(b)(6), a court must accept as true all factual allegations contained in the complaint, and the plaintiff receives the benefit of all favorable inferences that can be drawn from the facts alleged. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012); *Iqbal*, 556 U.S. at 678. A dismissal for failure to state a claim under Rule 12(b)(6) is a "judgment on the merits" and is "presumed to operate as a dismissal with prejudice unless the district court specifies otherwise." *Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc.*, 673 F. App'x 925, 929 (11th Cir. 2016) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505 (2001)).

A court considering a 12(b)(6) motion is generally limited to the facts contained in the complaint and attached exhibits—but may also consider documents referred to in the complaint that are central to the claim and whose authenticity is undisputed. *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009). While the court is required to accept as true all allegations contained in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. "Dismissal pursuant to Rule 12(b)(6) is not appropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004) (citation and quotation omitted). And "determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing

court to draw on its judicial experience and common sense." *Holland v. Carnival Corp.*, 50 F.4th 1088, 1093 (11th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 679).

## ANALYSIS

As explained herein, Plaintiff's claim under the Privacy Protection Act is barred by the Act's "border exception," 42 U.S.C. § 2000aa-5. Accordingly, the Court need not address the Government's remaining arguments.[1]

### I.      The Privacy Protection Act of 1980, 42 U.S.C. § 2000aa *et seq.*

The Privacy Protection Act of 1980 ("PPA") generally prohibits government officials, in connection with a criminal investigation, from searching for or seizing certain materials held by a person "reasonably believed" to intend to disseminate information to the public.  42 U.S.C. §

---

[1] Alternatively, the Court grants the MTD by default. This District's Local Rules required Plaintiff to "file and serve an opposing memorandum of law no later than fourteen (14) days after service" of the MTD. S.D. FLA. L.R. 7.1(c)(1). Defendant filed the MTD on January 23, 2026, meaning that Plaintiff's Response was due on February 6, 2026. On February 2, 2026, Plaintiff filed a Motion for Extension of Time to file a response—reflecting his awareness that the MTD had been filed against him—which the Court granted, extending his deadline to March 4, 2026. *See* Motion for Extension of Time, [ECF No. 54]; *see also* Omnibus Paperless Order, [ECF No. 55]. Though Plaintiff claimed not to have received the MTD, Defendant certified that it sent the MTD to the same facility at which Plaintiff was confined when he filed his Motion for Extension of Time. *See* MTD at 12; *see also* Motion for Extension of Time at 1. In any event, although the Court granted his request for an extension, Plaintiff still failed to file his Response or request additional time to do so, and, as Plaintiff further failed to file any Notice of Address Change on the docket within seven days of an address change, the Court's order was properly served. *See generally* Docket; *see also* S.D. FLA. L.R. 11.1(g).

Consequently, Plaintiff's failure to oppose Defendant's MTD "may be deemed sufficient cause for granting the [MTD] by default." S.D. FLA. L.R. 7.1(c)(1). At the very least, he has waived any objection thereto and has abandoned his claims against Defendant. *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The . . . failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); *Fawcett v. Carnival Corp.*, 682 F. Supp. 3d 1106, 1112 (S.D. Fla. 2023) (recognizing that "[t]he failure to respond to arguments regarding claims addressed in a motion to dismiss is sufficient basis to dismiss such claims as abandoned or by default" (citations omitted)); *see also Claiborne v. JP Morgan Chase Bank Nat'l Ass'n*, No. 22-13676, 2024 WL 65398, at *2 (11th Cir. Jan. 5, 2024) (recognizing that "*pro se* litigants are nevertheless required to follow procedural rules" (citing *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007))). Nevertheless, the Court will adjudicate the MTD, mindful of Plaintiff's *pro se* status and "the strong preference that cases be heard on their merits." *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1342 (11th Cir. 2014).

2000aa.  The Act provides that "a person aggrieved by a search for or seizure of materials in violation of this chapter shall have a civil cause of action for damages for such search or seizure . . . against the United States[,] which shall be liable for violations of this chapter by their officers or employees while acting within the scope or under color of their office or employment[.]"  42 U.S.C. § 2000aa-6(a)(1) (alterations added).

Congress enacted the Act to reinforce the First and Fourth Amendment interests implicated when the government conducts a "search and seizure of evidence belonging to those not under investigation."  *Henriquez v. Ga. Dep't of Revenue*, No. 21-12567, 2023 WL 4624473, at *10 (11th Cir. July 19, 2023); *see also id.* ("The purpose behind the PPA, as set forth in the Senate Committee on the Judiciary's report, was to afford additional statutory protection to the First and Fourth Amendment rights of the press and related groups." (citing S. Rep. No. 96-874, at 4–5)); *see also Times Publ'g Co. v. United States*, No. 23-MC-0014, 2023 WL 7411463, at *5 (M.D. Fla. Sept. 22, 2023); *Madaio v. Fed. Bureau of Investigation*, No. CV-06-BE-00904, 2008 WL 11392887, at *6 (N.D. Ala. Mar. 31, 2008) ("The [PPA] was intended to discourage law enforcement officers from targeting publishers simply because they often gathered 'mere evidence' of crime." (alteration added)).

The catalyst for the Act, according to legislative history, was the United States Supreme Court's decision in *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978), which upheld a search of a newspaper's offices despite the obvious First Amendment concerns presented.  *See* S. Rep. No. 96-874, at 4–5.  In so holding, the Court declined to impose any constitutional requirement under the Fourth Amendment that law enforcement proceed by subpoena or provide advance notice before searching the press.  *See Zurcher*, 436 U.S. at 567 ("[W]e decline to reinterpret the [Fourth] Amendment to impose a general constitutional barrier against warrants to search newspaper

premises, to require resort to subpoenas as a general rule, or to demand prior notice and hearing in connection with the issuance of search warrants."). The Act, therefore, reflects Congress's response by extending statutory free-speech protections in the search-and-seizure context where the Constitution, as explained in *Zurcher*, does not.

The Act draws distinctions between two protected categories of materials subject to search and seizure. It first safeguards "work product materials," meaning those materials "prepared, produced, authored, or created" "in anticipation of communicating such materials to the public"; which are "possessed for the purposes of communicating such materials to the public"; and which "include mental impressions, conclusions, opinions or theories of the person who prepared, produced, authored, or created such material." 42 U.S.C. § 2000aa-7(b)(1)–(3). Separately, the Act protects "documentary materials," which it defines broadly to include "written or printed materials, photographs, motion picture films, negatives, video tapes, audio tapes, and other" forms of "mechanically, magnetically, or electronically recorded cards, tapes, or discs." *Id.* § 2000aa-7(a). Drawing a clear boundary, the Act provides that neither "work product materials" nor "documentary materials" includes "contraband or the fruits of a crime or things otherwise criminally possessed." *Id.* § 2000aa-7(a)–(b). In this way, the Act protects both the process and the inputs of public communication, while preserving the government's authority to seize inherently unlawful items.

Consistent with that framework, the Act channels law enforcement toward means less intrusive than a traditional search and seizure—for instance, by use of a subpoena duces tecum for certain protected materials. *See id.* § 2000aa(b)(3), (b)(4) (contemplating "subpoena duces tecum" procedures as a default mechanism for producing "other documents"). But this prohibition isn't categorical. The Act permits searches or seizures in limited circumstances, including where: (1)

as for all protected materials, there is probable cause to believe that the possessor "has committed or is committing the criminal offense to which the materials relate";[2] (2) as for all protected materials, "immediate seizure is necessary to prevent" death or serious bodily injury; (3) as for "other documents," notice by subpoena would risk the "destruction, alteration, or concealment" of the materials; or (4) as for "other documents," the materials have not been produced despite a court order enforcing a subpoena, and where either "all appellate remedies have been exhausted" or further delay would "threaten the interests of justice." *Id.* § 2000aa(a)–(b).

Of particular relevance to this case is another exception to the Act's prohibitions—the "border exception"—which reads as follows:

> This chapter shall not impair or affect the ability of a government officer or employee, pursuant to otherwise applicable law, to conduct searches and seizures at the borders of, or at international points of, entry into the United States in order to enforce the customs laws of the United States.

42 U.S.C. § 2000aa-5.

The Court is unaware of any precedent, binding or otherwise, on the border exception's scope, and secondary sources seem to disagree on whether it applies to all border searches and seizures or only those conducted to enforce customs laws. *Compare, e.g.*, ANDREW B. SWERIN, THE PRIVACY PROTECTION ACT, INFO. SECURITY & PRIVACY: A GUIDE TO FED & STATE LAW & COMPLIANCE § 27:59 (speaking of the Act, "[t]his law explicitly does not apply in any way to searches at any border of the United States" (citing 42 U.S.C.A. § 2000aa-5)), *with* Cope et al.,

---

[2] This exception contains its own caveat, such that even where the materials relate to the criminal offense, an officer nevertheless "may *not* search for or seize such materials . . . if the offense to which the materials relate consists of the receipt, possession, communication, or withholding of such materials or the information contained therein." 42 U.S.C. §§ 2000aa(a)(1), (b)(1) (emphasis added). This caveat is inapplicable where the offense falls under any one of the statutorily listed offense categories, such as "national defense," "classified information," or "the sexual exploitation of children," *id.* §§ 2000aa(a)(1), (b)(1)—meaning that an officer can search for and seize the subject materials provided they satisfy the suspect exception.

*Digital Privacy at the U.S. Border: Protecting the Data on Your Devices and in the Cloud*, ELECTRONIC FRONTIER FOUNDATION, at 29 n.47, Mar. 8, 2017, https://www.eff.org/files/2017/03/10/digital-privacy-border-2017-guide3.10.17.pdf ("While the statute exempts border searches for the purpose of enforcing the customs laws, it does not exempt border searches for other purposes." (citing 42 U.S.C. § 2000aa-5)), *and* Scott Memmel, *Crossing Constitutional Boundaries: Searches and Seizures of Electronic Devices at U.S. Borders*, 25 COMM. L. & POL'Y 25, 49 (2020) ("EFF noted, however, that the exemption only applies to the enforcement of customs laws, rather than exempting border searches for other purposes, suggesting that the statute may still be a viable defense for journalists against warrantless searches and seizures of their electronic devices at U.S. borders." (citing Cope et al., *supra*)).

## II.     The Privacy Protection Act's "Border Exception" Bars Plaintiff's Claim

The parties dispute whether the Act's border exception bars Plaintiff's damages claim. Plaintiff insists that the exception "do[es] not apply here" because, he says, the Government planted "a 'questionable' photo . . . from a remote location on his smartphone, contact[ed] Colombian officials beforehand to have [it] sent to Miami International without delay, and alert[ed] U.S. Customs to be ready."[3]  Am. Compl. at 8.  The Government thereby "forc[ed] him to Miami International, where the search and seizure by U.S. Customs couldn't be avoided." *Id.* He thus maintains that he was "intentionally maneuvered into a situation, against his will, where he would be deprived of the protections afforded to him under the [Fourth] Amendment to the U.S.

---

[3]  A plaintiff is not permitted to advance legal arguments in their complaint.  But given Plaintiff's *pro se* status, the lack of a response, and the need to reach the merits, the Court will consider those facts that Plaintiff says bear on whether the border exception applies to him.  In doing so, the Court keeps in mind that its review "is not limited to whatever legal pronouncements that [Plaintiff] makes," *Roberts v. McBrier*, No. 22-CV-0191, 2023 WL 11969956, at *2 (N.D. Ga. Sept. 6, 2023), and that it may only "exercise jurisdiction on the basis of the factual circumstances involved," *Helms v. Blackwell*, 367 F.2d 149, 150 (5th Cir. 1966).

Constitution." *Id.* at 9. The Government responds that these allegations are "implausible" and that, regardless, the Act's border exception "applies in this case." MTD at 11. In its view, Plaintiff voluntarily "le[ft] the country with criminal materials" and "return[ed] with those materials," placing him squarely within the exception. *Id.* The Government adds that it "must be able to search persons and property attempting to enter—or reenter—the United States to ensure that the person is not transporting visual depictions involving the sexual exploitation of minors." *Id.*

These competing positions present a question no other court appears to have addressed: What does it mean for a government officer to conduct a search or seizure "in order to enforce the customs laws of the United States" under § 2000aa-5? Does the provision extend to all searches and seizures at the border, or is it limited by whether the search is undertaken, intentionally or otherwise, for a specific law-enforcement purpose? For the reasons that follow, the Court concludes that the border exception bars Plaintiff's claim.

To begin, some points are straightforward. No one disagrees that Plaintiff was subjected to a "search" or "seizure" carried out by a "government officer or employee" within the meaning of the Act. And Miami International Airport—where the materials[4] were allegedly seized— qualifies as an "international point[ ] of[ ] entry into the United States[.]" 42 U.S.C. § 2000aa-5. The parties' arguments, however, bring into focus the clause "in order to enforce the customs laws of the United States"—and, in particular, the phrase "in order to enforce." Plaintiff's theory rests on the Government's alleged subjective motive in orchestrating his presence at the border, while the Government's view rests on its asserted law-enforcement purpose of the search. Therefore,

---

[4] The Court assumes, and the parties do not dispute, that Plaintiff's seized digital photographs constitute "documentary materials" within the meaning of 42 U.S.C. § 2000aa-7(a), which explicitly lists "photographs" as a form of "documentary materials."

while neither party has framed the issue in these terms, resolving the meaning of that clause is dispositive here.

To interpret the meaning of "in order to enforce the customs laws of the United States," the Court begins with the plain text.  *See Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute." (citing *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004))); *BellSouth Telecomm'ns, Inc. v. Town of Palm Beach*, 252 F.3d 1169, 1187 (11th Cir. 2001) ("When interpreting a statute, 'it is axiomatic that a court must begin with the plain language of the statute.'" (quoting *United States v. Prather*, 205 F.3d 1265, 1269 (11th Cir. 2000))).  "And [courts] interpret the words of a statute based on their meaning at the time of enactment."  *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1190 (11th Cir. 2019) (citing *New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019)); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 7, at 78 (2012) ("Words must be given the meaning they had when the text was adopted.").

At the outset, the Court observes that § 2000aa-5 likely does not sweep in all searches and seizures at the border.  If it did, the provision would end after "entry into the United States[.]"  But it does not.  Instead, it continues, appearing to confine the exception to those searches and seizures conducted "in order to enforce the customs laws of the United States."  Reading the provision to cover all border activity would strip that limiting phrase of any work to do.  And "[a]bsent clear evidence that Congress intended this surplusage," the Court "is 'obligated to give effect, if possible, to every word Congress used.'"  *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128 (2018) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)).

Beginning with the phrase "in order to," its ordinary meaning—both before and after 1980—is one that "express[es] purpose: so as to do or achieve" an "end or outcome." OXFORD ENGLISH DICTIONARY (last visited Mar. 26, 2026), https://www.oed.com/dictionary/order_n?tab=meaning_and_use#33290604 (collecting uses of the phrase "in order to" from 1609 to 1994); *see also Oilfield Equip. Mktg., Inc. v. New Tech Sys., Inc.*, No. MO-02-CA-183, 2005 WL 6258387, at *7 (W.D. Tex. Sept. 2, 2005) (recognizing that "in order to" means "for the purpose of; as a means to" (citation omitted)), *aff'd*, 227 F. App'x 925 (Fed. Cir. 2007). Moreover, before and after the Act's enactment, "to enforce" was understood to mean "to compel obedience to." BLACK'S LAW DICTIONARY 474 (5th ed. 1979); *see also Schnell v. State Farm Lloyds*, 98 F.4th 150, 157 (5th Cir. 2024) ("To 'enforce' means '[t]o give force or effect to (a law, etc.); to compel obedience to.'" (listing sources)). Taken together, the phrase "in order to enforce" denotes action undertaken with the aim of giving effect to law—that is, conduct carried out for the purpose of compelling compliance with the "customs laws." 42 U.S.C. § 2000aa-5.

Nothing in this construction suggests that the Court must look at the searching officer's subjective motives. But Plaintiff sees it differently: he contends that the border exception cannot apply in his case because the Government conducted a search at an international port of entry that it knew it could not perform elsewhere, rendering any asserted border-related purpose pretextual. But even if § 2000aa-5's plain text supported Plaintiff's reading, its broader context does not. *See King v. Burwell*, 576 U.S. 473, 486 (2015) (recognizing that courts must read statutory provisions "in their context and with a view to their place in the overall statutory scheme" (cleaned up)).

The phrase "in order to" as written in § 2000aa-5 modifies the act of conducting "searches and seizures"[5]—three words plainly drawn from the Fourth Amendment. *See* U.S. CONST. AMEND

---

[5] It is a "fundamental canon of statutory construction that a qualifying phrase refers solely to its immediate antecedent." *Nat'l Coal. For Students With Disabilities Educ. & Legal Def. Fund v. Allen*, 152 F.3d 283,

IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."). Congress's "choice to follow the [Fourth] Amendment's terminology is most naturally read as carrying the meaning of the constitutional terms into the statute." *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 358 (2000) (Souter, J., concurring in part) (citing *United States v. Kozminski*, 487 U.S. 931, 945 (1988) ("By employing the constitutional language, Congress apparently was focusing on the prohibition of comparable conditions."); *Morissette v. United States*, 342 U.S. 246, 263 (1952) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.")). Given this express language, combined with the events leading up to the Act's enactment, the Court treats the Act as a codification of traditional Fourth Amendment principles. *See Citicasters v. McCaskill*, 89 F.3d 1350, 1359 n.3 (8th Cir. 1996) (Bright, J., concurring) (speaking of the Privacy Protection Act, "[t]he language of the statute implies that the Act was intended to be a statutory extension of the Fourth Amendment" (citation omitted)).

Under the Fourth Amendment, an officer's subjective motivation is not relevant to the legality of a search or to whether a search has occurred. It is well settled that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Scott v. United States*, 436 U.S. 128, 138

---

288 n.6 (4th Cir. 1998) (citation omitted). Though not immediately preceding "in order to," it is nevertheless unambiguous that "to conduct searches and seizures" is the antecedent phrase that it modifies; in other words, the border exception applies *only* to those searches and seizures conducted "in order to enforce" the United States customs laws.

(1978); *see also* 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT, § 9.2(e) (5th ed. 2014) (stating that it "is irrelevant" whether the officers possessed an uncommunicated intention to make a full-fledged arrest (footnotes omitted)).   In short, the Fourth Amendment adopts an objective framework: what matters is what the officer did, not what the officer thought.

That objective framework is at its apex at the border.   "Routine searches of the persons and effects of entrants (at the border) are not subject to *any* requirement of reasonable suspicion, probable cause, or warrant."  *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985) (emphasis added).   Indeed, "a secondary customs search following the initial inspection is proper even absent reasonable suspicion of criminal activity."  *United States v. Oluigbo-Bernards*, 638 F. App'x 868, 871 (11th Cir. 2016) (citing *United States v. Santiago*, 837 F.2d 1545, 1548 (11th Cir. 1988)).   To be sure, the legality of border searches is governed by a "reasonableness requirement . . . which adjusts the strength of suspicion required for a particular search to the intrusiveness of that search."  *United States v. Vega-Barvo*, 729 F.2d 1341, 1344 (11th Cir. 1984). But that standard, too, is objective, and, relevantly, facts leading up to the search—besides that it occurred at the border—usually do not play a role in the analysis.  *See United States v. Touset*, 890 F.3d 1227, 1232 (11th Cir. 2018) ("Ordinarily, searches at the border are reasonable without suspicion 'simply by virtue of the fact that they occur at the border.'" (quoting *United States v. Alfaro-Moncada*, 607 F.3d 720, 728 (11th Cir. 2010))).

This doctrinal backdrop governs the Court's reading of "in order to," which must be read in light of what it modifies—conducting "searches and seizures."  In this light, Plaintiff's effort to inject subjectivity would narrow the constitutionally permitted scope of searches and seizures in a way that § 2000aa-5 cannot bear.  As explained, at the border, and elsewhere, the officer's

subjective impressions do not determine whether a search or seizure is valid.  Although "nothing prevents Congress from enacting laws that provide greater protections" than the Constitution requires, *Touset*, 890 F.3d at 1236—and the Act embodies that principle—§ 2000aa-5 contains no indication that Congress intended to abandon the objective framework governing searches and seizures.

The purpose of the Act's border exception buttresses the Court's conclusion, and "[courts] must favor the 'textually permissible interpretation that furthers rather than obstructs' the statute's purposes."  *United States v. Bryant*, 996 F.3d 1243, 1256 (11th Cir. 2021) (quoting SCALIA & GARNER, § 4, at 63).  The border exception is one of the Act's several provisions in which "Congress took pains to limit the [Privacy Protection] Act's chilling effect on law enforcement." *Citicasters*, 89 F.3d at 1355 n.8.  Plaintiff's reading would have that effect.  Officers at the border have long relied on an objective reasonableness standard that permits searches regardless of any quantum of suspicion or improper state of mind.  The Court thus reads "in order to enforce" as an objective, purpose-based limitation that covers only those searches and seizures that are objectively undertaken to enforce the customs laws.

That conclusion raises the next question: what are "the customs laws of the United States" within the meaning of § 2000aa-5?  The Government contends that § 2000aa-5 bars Plaintiff's claim because, through the search and seizure, it was advancing its interest in ensuring that someone was "not transporting" into the country "visual depictions involving the sexual exploitation of minors."  MTD at 11.  But based on Plaintiff's well-pled allegations, to which the Court must apply the exception, it remains unclear what DHS agents were looking for with any specificity, other than that they seized all of Plaintiff's "digital media."  Am. Compl. at 6–7.  The Government would nevertheless be correct if a search and seizure that is conducted to prevent a

person from transporting digital contraband, such as the depictions it describes, falls under the "customs laws of the United States" within the meaning of the Act.

Again, the Court starts with the plain text. The Act does not define "customs laws of the United States." *See* 42 U.S.C. § 2000aa *et seq.* Although the phrase "customs laws of the United States" appears across various statutes, Congress has defined the phrase merely twice within the last twenty-six years. In 2000, Congress passed the Dog and Cat Protection Act, which introduced a new section in the Tariff Act of 1930 prohibiting the importation, exportation, sale, manufacture, offer for sale, transportation, and distribution in the United States of products made with dog and cat fur. *See* 19 U.S.C. § 1308(b)(1). In that section, "customs laws of the United States" was defined as "any other law or regulation enforced or administered by the United States Customs Service." *Id.* § 1308(a)(3). Eight years later, Congress enacted the Food, Conservation, and Energy Act of 2008, which added a new subtitle to the Tariff Act of 1930 with respect to imports of softwood lumber. *See* 19 U.S.C. §§ 1683–1683(g). That subtitle defines "customs laws of the United States" as "any law or regulation enforced or administered by U.S. Customs and Border Protection." *Id.* § 1683(3). History can explain the difference between these two definitions. Before 2003, the United States Customs Service was a bureau within the Department of the Treasury; however, it was reorganized as the Bureau of Customs and Border Protection and transferred to the Department of Homeland Security upon passage of the Homeland Security Act of 2002.[6] *See* Pub. L. No. 107-296, § 1502 (2002).

---

[6] Before the U.S. Customs Service was reorganized, customs agents and immigration inspectors had distinct roles and powers. As the Eighth Circuit once explained, immigration inspectors, acting under the immigration laws, "[did] not have the authority to search bags, containers, or compartments too small to conceal persons." *United States v. Popow*, 821 F.2d 483, 487 (8th Cir. 1987). That authority instead belonged to customs officers. But the two roles could overlap through formal designation: by "proper delegations," an immigration inspector could be designated to perform the duties of a customs inspector by the Secretary of the Treasury, such that "any officer of the Bureau of Customs of the Treasury Department . . . or any agent or other person authorized by law or designated by the Secretary of the

But § 2000aa-5 was enacted in 1980 and has not been amended since.  What, then, can the Court do with these later definitions?  It is well settled that "later enacted laws . . . do not declare the meaning of earlier law."  *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998); *see also id.* at 269–70 (Scalia, J., dissenting) ("This later amendment can of course not cause [the statute] to have meant, at the time of petitioner's conviction, something different from what it then said.").  Still, since those statutes use the same phrase—"customs laws of the United States"—they at least bear on the analysis here.  Under the rule of *in pari materia*, "a later act can . . . be regarded as a legislative interpretation of [an] earlier act . . . in the sense that it aids in ascertaining the meaning of the words as used in their contemporary setting" and "is therefore entitled to great weight in resolving any ambiguities and doubts."  *United States v. Stewart*, 311 U.S. 60, 64–65 (1940).  The rule "necessarily assumes that whenever Congress passes a new statute, it acts aware of all previous statutes on the same subject[.]"  *Erlenbaugh v. United States*, 409 U.S. 239, 243–44 (1972) (citing *Allen v. Grand Central Aircraft Co.*, 347 U.S. 535, 541–52 (1954)); *see also* SCALIA & GARNER, § 54, at 323 ("[W]hen a statute uses the very same terminology as an earlier statute—especially in the very same field—it is reasonable to believe that the terminology bears a consistent meaning.").  Here, in light of the 2002 agency reorganization, the only later statutory definition of "customs laws of the United States" that bears on this question is 19 U.S.C. § 1308(a)(3), enacted twenty years after the Act.  That provision defines "customs laws" as "any other law or regulation enforced or administered by the United States Customs Service."  19 U.S.C. § 1308(a)(3).

---

Treasury to perform duties of an officer of the Customs Service" served as a customs inspector. *Id.*  The reverse was also true.  A customs officer could be designated to act as an immigration inspector, meaning "any employee . . . designated by the Attorney General . . . to perform the functions of an immigration officer" served in that role. *Id.*; *see also* 8 U.S.C. § 1101(a)(18) (1982).  So, while one person could wear both hats through delegation, the baseline rule was clear that customs and immigration officers began as separate authorities with different powers, and the two roles could only become interchangeable when formal designation occurred.

Assuming *arguendo* that "customs laws of the United States" in § 2000aa-5 refers only to laws or regulations enforced or administered by the now-defunct United States Customs Service, the Court finds that it still applies and thus bars Plaintiff's claim, provided that the object of the search and seizure was the possible entry of digital contraband into the country.[7]  At the time of the Act's enactment, "[c]ustoms agents [were] authorized to prevent the importation of . . . contraband into the United States."  *United States v. Rivera*, 595 F.2d 1095, 1098 (5th Cir. 1979); *see also United States v. Thirty-Seven Photographs*, 402 U.S. 363, 376 (1971) ("Customs officers characteristically inspect luggage and their power to do so is not questioned[;] it is an old practice and is intimately associated with excluding illegal articles from the country."); *United States v. Soria*, 519 F.2d 1060, 1062 (5th Cir. 1975) ("Customs agents are charged with preventing the importation of contraband into the United States.  Congress has granted the agents broad statutory authority to stop and search for contraband." (citations omitted)).

Congress has rendered child sexual abuse material ("CSAM") contraband by criminalizing its importation, transportation, receipt, and possession.  *See* 18 U.S.C. §§ 2252, 2252A.  Such contraband falls squarely within the scope of customs enforcement,[8] consistent with the historical

---

[7]  "At the motion-to-dismiss stage, courts consider only the complaint and the reasonable inferences they can draw from it." *Singleton v. Allen*, 740 F. Supp. 3d 1138, 1152 (N.D. Ala. 2024) (citations omitted). Applying that standard, the Court finds that the seizure of Plaintiff's digital media by DHS agents at an international point of entry is best understood as serving a customs-law enforcement purpose.  Plaintiff alleges that (1) DHS agents conducted the search at an international port of entry; (2) they seized his phone and other digital media; (3) the search was prompted by a "questionable photo" on his device, Am. Compl. at 8; and (4) the seized images, in his view, would not be considered "child pornography" or "CSAM," *id.* at 9.  Taken together, these allegations indicate that the seizure was directed at suspected illicit digital material, *i.e.*, contraband, within the scope of customs laws.  An alternative inference—that DHS agents acted as general-purpose criminal investigators pursuing a targeted matter unrelated to the entry of contraband—is not supported by any plausible factual allegations in the Amended Complaint and thus cannot be drawn at the motion-to-dismiss stage.

[8]  Customs law permits officers to "examine, inspect, and search . . . any . . . package or cargo" entering the United States, 19 U.S.C. § 1581(a), and to seize "merchandise which is introduced or attempted to be introduced into the United States contrary to law," including merchandise that "is stolen, smuggled, or clandestinely imported or introduced," *id.* § 1595a(c)(1)(A), (c)(2)(A).

authority of customs officials.  Notably, when the Act was passed, customs agents were permitted to conduct searches to prevent the importation of obscene and pornographic materials.  *See Thirty-Seven Photographs*, 402 U.S. at 375–76 (construing 19 U.S.C. § 1305(a)); *see also id.* at 376 ("[W]e have today held that Congress may constitutionally prevent the mails from being used for distributing pornography." (citing *United States v. Reidel*, 402 U.S. 351 (1971))).[9]  Moreover, that Plaintiff's suspected contraband was in digital form certainly does not bring it outside the bounds of the Act; "[i]f anything, the advent of sophisticated technological means for concealing contraband only heightens the need of the government to search property at the border."  *Touset*, 890 F.3d at 1235; *see also id.* at 1231 (holding that "the Fourth Amendment does not require any suspicion for forensic searches of electronic devices at the border" where an officer of the Customs and Border Protection Agency inspected the defendant's iPhones and camera); *United States v. Mendez*, 103 F.4th 1303, 1309 (7th Cir. 2024) ("The government's interest in detecting child pornography at the border is just as strong as its interest in intercepting firearms, narcotics, or any other prohibited item." (citations omitted)); *United States v. Cano*, 934 F.3d 1002, 1014 (9th Cir. 2019) ("The best example [of digital contraband] is child pornography.").

The Court need not rely on the doctrine of *in pari materia* to resolve this case, as it would be unworkable to limit § 2000aa-5's reference to "customs laws of the United States" to those laws

---

[9]  It is true that, in *Thirty-Seven Photographs*, the Supreme Court "construe[d] [19 U.S.C.] § 1305(a) to require intervals of no more than 14 days from seizure of the goods to the institution of judicial proceedings for their forfeiture and no longer than 60 days from the filing of the action to final decision in the district court."  402 U.S. at 373.  The Court imposed those limits to avoid First Amendment concerns that arise when potentially protected expressive material is seized and not promptly adjudicated.  *See id.*; *see also Freedman v. Maryland*, 380 U.S. 51, 58–59 (1965) (striking down a state film-licensing scheme that required prior approval before exhibition and holding that there must be assurance that the censor will, "within a brief period," "either issue a license or go to court").  But this limitation announced in *Thirty-Seven Photographs* does not extend to § 2000aa-5.  The case governed the timing of forfeiture proceedings for expressive materials in criminal cases to prevent prolonged suppression of speech.  The Privacy Protection Act, by contrast, creates a civil damages remedy—not a forfeiture scheme—and § 2000aa-5 simply defines when liability does not attach.  So the First Amendment concerns that drove the outcome in *Thirty-Seven Photographs* are not implicated in the same way here.

as they existed before the creation of Customs and Border Protection.  What of all customs laws enacted decades later?  Nothing in the Act suggests that, by referring to "customs laws," Congress meant to fix those terms to a closed set of statutes.  Rather, the phrase clearly references a body of law, ostensibly enforced by the relevant agency, which supports a general reference reading. Under the general reference doctrine, which is applied "[w]hen a statute adopts the general law on a given subject, the reference is construed to mean that the law is as it reads thereafter at any given time including amendments subsequent to the time of adoption."  *Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145, 1157 (11th Cir. 2019) (quoting *Longmire v. Sea Drilling Corp.*, 610 F.2d 1342, 1352 (5th Cir. 1980)); *New Prime Inc.*, 586 U.S. at 113 (discussing the general reference canon and recognizing that, "[o]f course, statutes may sometimes refer to an external source of law and fairly warn readers that they must abide that external source of law, later amendments and modifications included").

Read this way, § 2000aa-5 incorporates a body of customs law that evolves over time and is enforced and construed as it exists at the time of application.  *See, e.g.*, *El Encanto, Inc. v. Hatch Chile Co., Inc.*, 825 F.3d 1161, 1164 (10th Cir. 2016) ("The fact is that the plain language of [35 U.S.C.] § 24 doesn't suggest that a reader must look to the Federal Rules of Civil Procedure as they were back when the statute was enacted.  To the contrary, as written the language suggests that a reader may look to the rules as they are found on any given day, today included.").  This reading is reinforced by the fact that, on the two occasions Congress has defined the phrase "customs laws of the United States," it has done so by reference to the agency charged with enforcing those laws, rather than by providing any substantive description of them.  And it is of no moment that the United States Customs Service no longer exists.  It has not disappeared; it has been reorganized, and those same laws now operate within a new agency with expanded powers.

At the time of the Act's enactment, Congress knew that it could later enlarge, limit, or modify the enforcement powers of that agency. *See Office of Consumers' Counsel v. Federal Energy Regulatory Comm'n*, 655 F.2d 1132, 1149, 1153 (D.C. Cir. 1980) (suggesting that Congress could have altered the Federal Energy Regulatory Commission's authority by passing new legislation); *Stop H-3 Ass'n v. Dole*, 870 F.2d 1419, 1437 (9th Cir. 1989) ("It is fully within Congress'[s] prerogative legislatively to alter the reach of the laws it passes . . . ."); *First Gibraltar Bank, FSB v. Morales*, 42 F.3d 895, 901 (5th Cir. 1995) ("As part of its legislative powers, Congress designates the scope of agency authority, and if Congress so chooses, it can subsequently restrict or limit that delegation of power to the agency.").

The general reference doctrine thus forecloses a reading of "customs laws of the United States" that is fixed only to those laws in place at enactment. The Court instead treats the provision as referring to those laws enforced or administered by the modern agency—Customs and Border Protection.[10] And this reading, the Court finds, fairly recognizes "the balance struck by Congress between preserving the ability of government officials" to search the nation's borders and "protecting those engaged in the dissemination of information from government intrusion." *Citicasters*, 89 F.3d at 1355 n.8.

---

[10] Legislative history may support a reading of § 2000aa-5 that limits "customs laws" to those governing the interdiction of contraband or unlawful materials entering the country. *See* S. Rep. No. 96-874, at 13–14 (1980) (explaining that "the limitations on governmental search and seizure provided by this statute are not to apply to searches at the borders or at international ports of entry into the United States pursuant to the enforcement of the customs laws of the United States," and that "these searches are generally of a routine, nonintrusive nature and are designed to prohibit the introduction of contraband or unlawful materials into the United States, and to facilitate the assessment and collection of duties and tariffs"). But reliance on legislative history would cut against applying the general reference doctrine, which is compelled by the text. The Court therefore does not consider legislative history. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."); *cf. CRI-Leslie, LLC v. Comm'r of Internal Revenue*, 882 F.3d 1026, 1033 (11th Cir. 2018) ("In a contest such as we have here, between clear statutory text and (even compelling) evidence of sub- or extra-textual 'intent,' the former must prevail.").

To summarize, the Court interprets "searches and seizures" conducted at the border "in order to enforce the customs laws of the United States" to mean those searches and seizures that are objectively undertaken to enforce the laws and regulations enforced and administered by Customs and Border Protection.[11]  That reading compels dismissal of this case.  Plaintiff affirmatively alleges that "U.S. Customs officials and agents from the Dep[artment] of Homeland Security proceeded to seize indiscriminately all of [his] digital media" at an international port of entry.  Am. Compl. at 6–7.  Based on his allegations, that search was objectively undertaken to serve a customs-law enforcement purpose.  Because the Act's creation of a civil right to damages "shall not impair or affect the ability of a government officer or employee" to conduct such searches, Plaintiff's claim is barred under § 2000aa-5.

## CONCLUSION

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** that the Defendant's Motion to Dismiss, **[ECF No. 51]**, is **GRANTED**.  Plaintiff's Amended Complaint, **[ECF No. 19]**, is **DISMISSED**.  All pending motions are **DENIED as moot** and all deadlines, if any, are **TERMINATED**.  This case is **CLOSED**.

**DONE AND ORDERED** in Miami, Florida, this 26th day of March, 2026.

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**

---

[11]  To give effect to § 2000aa-5's "in order to" clause as a meaningful limitation on "searches and seizures," the Court can envision searches undertaken to enforce laws unrelated to Customs and Border Protection's functions, such as searches conducted solely to obtain evidence of tax evasion, securities fraud, public corruption, or other purely domestic offenses untethered to the entry of goods or persons into the United States.  Under the Court's reading, such searches could not be subject to § 2000aa-5 because they would not be objectively undertaken to enforce any law enforced or administered by Customs and Border Protection.

cc:    Christopher J. Madaio
       25435-001
       Miami FDC
       Federal Detention Center
       Inmate Mail/Parcels
       Post Office Box 019120
       Miami, FL 33101
       PRO SE